UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Theresa McGuire,

    Plaintiff,

    v.                                                        Civil Action No. 5:11-CV-24

Michael J. Astrue,
Commissioner of Social Security,

    Defendant.

## **REPORT AND RECOMMENDATION**
(Docs. 14, 19)

    Plaintiff Theresa McGuire brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. Pending before the Court are McGuire's motion to reverse the Commissioner's decision (Doc. 14), and the Commissioner's motion to affirm the same (Doc. 19).

    For the reasons stated below, I recommend that McGuire's motion be DENIED, and the Commissioner's motion be GRANTED.

## **Background**

    McGuire was twenty-five years old on her alleged disability onset date of October 31, 2000. She is educated through the tenth grade, having dropped out of school in the eleventh grade. (AR 573.) She has worked as a chambermaid and a general office clerk, and has some training in clerical legal aid work. During the alleged disability

period, she lived with her boyfriend and three children, and was a homemaker and the primary care provider for her children. (AR 501, 573.)

McGuire has a family history of alcohol and drug abuse on both maternal and paternal sides. (AR 501.) Her childhood was traumatic, with her observing almost daily domestic abuse of her mother by her father. (*Id.*; AR 613.) Her mother was an alcoholic, and was incarcerated for stealing when McGuire was a teenager. (AR 501.) Her father died when she was nineteen, at a time when her mother was incarcerated, leaving her to care for her younger sister. (AR 501, 572.)

For portions of the alleged disability period, McGuire suffered chronic pain due to temporomandibular joint pain ("TMJ")[1] and degenerative disc disease. She also had asthma, eczema, and Hepatitis C; and was diagnosed with post-traumatic stress disorder ("PTSD") and social anxiety. (AR 501-02.) McGuire alleges that her doctors over-medicated her in an attempt to alleviate her chronic pain, which resulted in her becoming addicted to opiates for approximately ten years. (AR 494, 501, 574.) She also smoked cigarettes and used marijuana for substantial portions of the alleged disability period. (AR 572, 738.) In or around 2007, McGuire attended a detoxification program; and as of January 2009, she was attending a methadone clinic daily. (AR 575.)

---

[1] The temporomandibular joint is "'the area directly in front of the ear on either side of the head where the upper jaw . . . and lower jaw . . . meet.'" *Ramirez ex rel. Zetino v. Astrue*, No. 10-CV-03522 (KAM), 2012 WL 372011, at *5 n.11 (E.D.N.Y. Feb. 3, 2012) (quoting *Temporomandibular Joint Disorder (TMJ Disorder)*, MedicineNet.com, http://www.medicinenet.com/temporomandibular_joint_disorder/article.htm (last visited Feb. 3, 2012)). "TMJ" is a colloquial abbreviation for "temporomandibular joint dysfunction," which is defined as "chronic or impaired function of the temporomandibular articulation." STEDMAN'S MEDICAL DICTIONARY 596, 1994 (28th ed. 2006).

In July 2008, McGuire filed an application for disability insurance benefits. Therein, she alleged that, starting on October 31, 2000, she had been unable to work due to PTSD, social anxiety, TMJ, Hepatitis C, and "drug addiction." (AR 183.) She further alleged that she had panic attacks when out in public and flashbacks of her parents arguing; she was in pain because of her TMJ; she was tired and run-down because of her Hepatitis C; and she was unable to function because of her opiate addiction. (*Id.*) McGuire's application was denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was conducted on April 19, 2010 by Administrative Law Judge ("ALJ") Thomas Merrill. (AR 42-68.) McGuire appeared and testified, and was represented by counsel. A vocational expert also testified at the hearing. On August 24, 2010, the ALJ issued a decision finding that McGuire was not disabled under the Social Security Act from her alleged onset date of October 31, 2000 through the date of the decision. (AR 25-36.) On November 23, 2000, the Decision Review Board ("DRB") notified McGuire that it had selected the ALJ's decision for review, and was issuing its own "corrective decision," ultimately agreeing with the ALJ that McGuire was not disabled during the relevant period. (AR 4-6.) Having exhausted her administrative remedies, McGuire filed the Complaint in this action on January 25, 2011. (Doc. 3.)

## ALJ/DRB Decisions

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), meaning "the most [the claimant] can still do despite [his or her mental and physical] limitations," based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945. The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

4

Employing this sequential analysis, ALJ Merrill first determined that McGuire had not engaged in substantial gainful activity since her alleged onset date of October 31, 2000. (AR 28.) At step two, the ALJ found that McGuire had the severe impairment of polysubstance abuse. (*Id.*) Conversely, the ALJ found that McGuire's TMJ, Hepatitis C, PTSD, social anxiety, asthma, migraine headaches, low back pain, and depression were nonsevere, as they did not cause more than minimal limitation in McGuire's ability to perform basic work activities. (AR 28-29.) At step three, the ALJ found that none of McGuire's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 30.)

Next, the ALJ determined that McGuire had the RFC to perform a full range of work at all exertional levels without any exertional limitation, except as follows:

> [McGuire] can understand and remember 2 to 3 step instructions of a routine nature, can sustain attention and concentration for routine tasks and maintain effort for extended periods of time over the course of a normal workday and week with acceptable pace and persistence, has difficulty interacting with the public on a regular basis, but is capable of superficial interaction on an individual basis and able to participate in typical interactions with coworkers and supervisors while completing routine tasks of a nonsocial nature, she can maintain adequate grooming and hygiene, has adequate stress tolerance acceptable for a stable work setting, can adapt to minor changes in routine, is capable of independent goal[-]directed behavior, while completing routine tasks[,] is aware of hazards and she can travel independently in local neighborhoods.

(AR 31.) Given this RFC, and considering the vocational expert's testimony, the ALJ found that McGuire was capable of performing her past relevant work as a chambermaid and a general office clerk. (AR 35.) The ALJ concluded that McGuire had not been disabled from the alleged onset date through the date of the decision. (*Id.*)

5

As noted above, the DRB selected the ALJ's decision for review, and issued a "corrective decision." (AR 4-6.) Therein, the DRB agreed with all of the ALJ's findings, except it did not adopt the ALJ's findings that McGuire's anxiety and depression were nonsevere. (AR 4.) Nonetheless, the DRB found the ALJ's step-two error harmless, explaining: "While the [ALJ's] decision concludes that [McGuire's] anxiety and depression were not severe impairments, it is clear from reading the decision that, in fact, those impairments were evaluated and considered as if severe when assessing [McGuire's] credibility and [RFC]." (AR 4-5.) Accordingly, the DRB concluded that the findings of the ALJ, as modified, were supported by substantial evidence, and McGuire was not disabled from the alleged onset date of October 31, 2000 through the date of the ALJ's decision. (AR 5.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

6

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should consider that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## **Analysis**

McGuire argues that the ALJ's RFC determination was not supported by substantial evidence. Specifically, McGuire claims that the RFC determination did not adequately account for McGuire's social anxiety, and that neither the ALJ nor the DRB properly analyzed the evidence showing that McGuire's ability to socialize and interact with others was seriously impaired. (Doc. 14-1 at 16-18.) The Commissioner responds that substantial evidence supports the ALJ and DRB's findings regarding McGuire's

abilities to interact with others, and demonstrates that McGuire's social limitations were not as severe as alleged. (Doc. 19-1 at 7.)

As discussed above, after the third step of the sequential evaluation, the ALJ must determine the claimant's RFC, which the regulations define as "the most [a claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a). A claimant's RFC is an "administrative finding[] that [is] dispositive of a case," and not a "medical issue[] regarding the nature and severity of [the claimant's] impairment[s]." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996) (citing 20 C.F.R. § 404.1527(e)); *see Santiago v. Sec'y of Health and Human Servs.*, 944 F.2d 1, 4 (1st Cir. 1991) (no medical RFC opinion necessary where record demonstrated mild mental and physical impairments). Therefore, in determining a claimant's RFC, the ALJ considers not only the medical opinions, but "*all* relevant evidence." *Schacht v. Barnhart*, No. 3:02 CV 1483, 2004 WL 2915310, at *12 (D. Conn. Dec. 17, 2004) (citing 20 C.F.R. §§ 404.1545- 404.1546) (emphasis in original). It is the plaintiff's, not the Commissioner's, burden to provide the evidence used to make an RFC determination. 20 CFR § 404.1545(a)(3).

The ALJ's RFC determination included the following social limitations: McGuire had "difficulty interacting with the public on a regular basis," but was capable of "superficial interaction on an individual basis" and was able to participate in "typical interactions with coworkers and supervisors while completing routine tasks of a nonsocial nature." (AR 31.) The ALJ provided a detailed explanation for this determination, relying on objective medical evidence, subjective factors including McGuire's activities of daily living, and medical opinions.

8

With respect to McGuire's activities of daily living, as part of his step-two analysis, the ALJ accurately stated: "[T]he evidence of record documents that [McGuire] has remained quite functional, caring for [her] children, attending abstinence treatment, getting her driver's license, moving into a new apartment and neighborhood, accessing resources[,] and dealing with her eldest daughter's troubles with the . . . state division of youth services." (AR 28 (citing AR 649-743).) The ALJ also correctly considered that, although McGuire stated she could not go to a public swimming pool or to her daughter's sixth grade graduation, she was able to "attend race tracks to watch races" (AR 472), participate in a community dinner with her children at a local church twice a month (AR 196), attend a "PowWow" (AR 670), go out to dinner (*id.*), and attend her daughter's kindergarten activities (AR 718). (AR 28-29.) The ALJ further accurately noted that McGuire had relationships with her three children, a boyfriend, and "a couple of close friends." (AR 29 (citing AR 196).)

As part of his RFC assessment, the ALJ properly considered that McGuire was able to perform activities of daily living, get her daughter into a preschool, prepare her children for school, complete a group drug recovery program, keep appointments with her primary care physician, and attend a woman's twelve-step group every week. (AR 32; *see* AR 192-95, 660, 670, 672, 676-77, 682.) The ALJ also correctly pointed out that, in 2008, McGuire was talking to her medical providers about earning her GED, going to college, and getting a job. (AR 32; *see* AR 653, 680.) In fact, in January 2008, a medical provider at the Howard Center "encouraged" McGuire to pursue these career goals; and in March 2008, McGuire told that provider that she "would like to work at least part-

time" and was setting up an appointment with job counseling. (AR 653, 680.) In August 2008, as recognized by the ALJ, McGuire was attending vocational rehabilitation to determine what courses and training she needed for a future career. (AR 32, 670, 677, 682.) A January 2009 treatment note from the Howard Center states that McGuire "participated actively in session," and was "pleasant and forth-coming about her use." (AR 701.) A March 2010 treatment note from the same provider states that McGuire "continues to do well with advocating for herself and in accessing resources." (AR 729.) The ALJ discussed all of this evidence in his decision, setting forth a condensed time-line documenting McGuire's mental status and activities of daily living, as reflected in the record, from approximately 2006 through April 2010. (AR 31-33.)

This evidence constitutes substantial evidence to support the ALJ's mental RFC determination; and that determination should be upheld regardless of whether this Court, hearing the same evidence *de novo*, might come to a different conclusion. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982); *Rivera v. Harris*, 623 F.2d 212, 216 (2d Cir. 1980); *see Lazore v. Astrue*, 443 F. App'x 650 (2d Cir. 2011). In her motion, McGuire lists particular evidence which she alleges "highlight[s]" her significant social limitations, and thus demonstrates the ALJ's error with respect to his RFC determination.[2] (*See* Doc. 14-1 at 18-20.) For the reasons stated below, I disagree, and find that the evidence taken

---

[2] The ALJ's RFC determination relies in part on his finding that McGuire was not entirely credible (*see* AR 31); but McGuire does not challenge the ALJ's credibility finding. Nor does McGuire challenge the ALJ's severity determination, as corrected by the DRB (*see* AR 4-5, 28-30), or the ALJ's detailed assessment of the medical opinion evidence (*see* AR 33-35). Given that the only issue raised in McGuire's motion and reply is the ALJ's RFC determination, this Report and Recommendation addresses solely that issue, discussing the ALJ's other findings only to the extent necessary to determine the propriety of that determination.

as a whole supports the ALJ's conclusion that McGuire "is quite functional despite being socially anxious." (AR 33.)

First, McGuire points to Dr. William Schaffer's June 2007 consultation note stating that McGuire had social isolation caused by anxiety and excessive fears about being in crowds, and resulting in her missing her daughter's sixth grade graduation and being unable to go to a public swimming pool. (AR 472.) The same note also states, without explanation regarding the apparent inconsistency, that McGuire "can however attend race tracks to watch races." (*Id.*) McGuire also refers to Howard Center intake notes from the same period which state that McGuire had severe "maturational problems." (AR 501.) Despite these problems, however, these intake notes indicate that McGuire was able to be "a full[-]time homemaker" for her three children, and "like[d] being a mom." (AR 501, 502.) The notes also state that McGuire had several social interests, including car-racing and dancing. (AR 502.) Further, the notes assign a Global Assessment of Functioning ("GAF") score of 60 to McGuire (*id.*), which reflects only moderate symptoms and moderate difficulty in social, occupational, or school functioning. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 32 (4th ed. 2000).

Next, McGuire observes that alcohol and drug counselor Libby Kennedy noted on one occasion that McGuire "need[ed] to call her ex-husband so that she [could] go to the store for supplies." (AR 659.) This proves little, given that the record amply demonstrates that McGuire frequently could not go places because she did not have a means of transportation. For example, a December 2004 progress note states that

McGuire could not attend physical therapy because she had "no transportation available." (AR 332.) And a March 2006 progress note reports that transportation was a "major problem" for McGuire. (AR 311.) An August 2007 progress note states that "[l]ack of transportation" limited McGuire so shat she could not go to twelve-step meetings or enjoy recreational activities. (AR 661.) McGuire claims that the ALJ failed to properly develop the issue of her ability to perform activities independently, without the companionship of her boyfriend. (*See* Doc. 14-1 at 20.) But in fact, the ALJ specifically asked McGuire at the hearing how her social phobia would affect her attendance at the hearing "without having [her] boyfriend there to be with [her]." (AR 53.) McGuire responded: "For one, I don't have a license right now . . . ." (*Id.*) She then went on to discuss her avoidance of people and "abandonment issues." (*Id.*) Thus, although McGuire's testimony supports the allegation that she suffers from social phobia, it also reflects that there were other reasons for her lack of social activity, including the lack of a driver's license and means of transportation. It is noteworthy that, a few months after McGuire obtained her license in March 2008 (*see* AR 680), she told a medical provider that she "like[d] the quiet time of driving [to her treatment] daily" (AR 671), suggesting that she made the drive by herself and without her boyfriend.

McGuire also points to April 2010 treatment notes from nurse practitioner Alison Parker stating that McGuire's anxiety was so bad that "she really [could not] go anywhere without her partner." (AR 9.) Again, the record demonstrates that McGuire's inability to go anywhere by herself was in large measure the result of her transportation problems. (*See, e.g.,* AR 53, 311, 332, 661.) Moreover, approximately two months later,

notes from the same practitioner state that, although there were a lot of "stressors" in McGuire's life, including "her children seeing various counselors and the like," her anxiety was "fairly well[-]controlled." (AR 9.)

McGuire argues that the ALJ should have considered social worker Lyressa Chein's opinion that McGuire had "[m]arked difficulties" in maintaining social functioning. (AR 604-05.) The ALJ, however, properly explained his decision to give little weight to this opinion, accurately noting that: (a) Chein was not an "acceptable medical source"; and (b) Chein's opinion "overstate[d] the limitation of [McGuire's] mental functioning in a manner inconsistent with the objective findings, given documentation in the record regarding [McGuire's] accomplishment in such activities of daily living as being able to access resources and attend to her children." (AR 34.) *See* SSR 06-03p, 2006 WL 2329939, at *2, 4 (Aug. 9, 2006) (distinguishing "acceptable medical sources," including licensed physicians and psychologists, from "other sources," such as social workers, but stating that ALJs must use the same factors for evaluation of "other source" opinions as are used for evaluation of "acceptable medical source" opinions, including the degree to which the opinion is supported by other evidence and the opinion's consistency with the record as a whole) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).

McGuire also points to Dr. Shirley Oxidine's January 2009 consultant report which states that McGuire had phobias regarding crowds, problems leaving the house unaccompanied, panic symptoms, avoidant behavior, and restricted daily activities. (AR 573-75.) The ALJ gave "limited weight" to this report on the grounds that it was "not
13

consistent with [McGuire's] level of progressive accomplishment with activities of daily living documented in the treatment progress notes of [McGuire's] therapist." (AR 34.) This was an appropriate reason to discount Dr. Oxidine's report, and it is supported by the record, as discussed above. *See* 20 C.F.R. § 1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Moreover, Dr. Oxidine's report was largely based on McGuire's statements to Dr. Oxidine, at least two of which are not supported by the record. First, the report states that McGuire "hear[d] 'screaming' inside her head" (AR 575), but treatment notes from Fletcher Allen Healthcare state that she had "no psychotic symptoms" (AR 472) and Howard Center records indicate that McGuire did not "[h]ear voices" (AR 500). Second, Dr. Oxidine's report states that McGuire "ha[d] panic attacks while trying to shop for groceries" (AR 574), but McGuire asserted in her Function Report that she was able to shop in stores for food and household needs two times each month for two hours at a time (AR 195).

The ALJ's decision to afford only "limited weight" to Dr. Oxidine's report is also supported by the opinions of agency consultants Drs. J. Coyle and Thomas Reilly, who opined that, although McGuire "would have trouble interacting with the general public on a regular basis," she was "capable of brief superficial interactions on an individual basis" and could "participate in typical interactions with coworkers and supervisors while completing routine tasks of a nonsocial nature." (AR 583, 601.) The ALJ gave these opinions "significant weight," on the proper grounds that they were most consistent with the record as a whole. (AR 33-34.) *See* SSR 96-6p, 1996 WL 374180, at *3 (1996)

(permitting ALJs to give more weight to the opinions of non-examining agency consultants than to those of treating sources, when the former are supported by evidence in the record and the latter are not).

Next, McGuire suggests that the limitations stated in Dr. Preis's April 2010 report should have been accounted for in the ALJ's RFC determination. In that report, Dr. Preis stated that McGuire experienced "severe anxiety – sometimes to the point of almost a panic attack," trusted no one except her boyfriend, was "very socially isolated," lived with a "terrible sense of dread and chronic fear every minute of every day," and had "terrible" self-esteem and "minimal coping skills." (AR 614-15.) Dr. Preis further stated that McGuire was "totally housebound" prior to correct medication being prescribed, and would leave the house only with her boyfriend and only to visit family or close friends of her boyfriend. (AR 615.) The Doctor opined that McGuire had "[m]arked difficulties" in maintaining social functioning. (AR 631.) The ALJ gave "little weight" to this opinion on the grounds that it "overstate[d] the limitation of [McGuire's] mental functioning in a manner inconsistent with [Dr. Preis's] earlier November 2009 assessment that [McGuire's] depression and anxiety were well[-]controlled on medication." (AR 34.) This finding is accurate, as Dr. Preis indeed stated in a November 2009 letter report that, with medication, McGuire's depression and panic disorder were "well[-]controlled" (AR 739), and her anxiety disorder was "under excellent control" (AR 740). Dr. Preis further stated: "[McGuire] has had an excellent response to [medication]. She has improved focus, better ability to be organized in all aspects of her life, improved self[-]esteem[,] and improved ability to analyze problems and to clearly look at all the options for solving

15

the problem." (AR 740.) As with Dr. Oxidine's report, the ALJ was entitled to attribute less weight to Dr. Preis's April 2010 report based on its inconsistency with the record as a whole, including Dr. Preis's own earlier report. *See* 20 C.F.R. § 1527(c)(4). The ALJ also properly noted, in weighing the opinion of Dr. Preis, that the Doctor wrote in her November 2009 report that McGuire's marijuana use had "dropped dramatically" (AR 740), while another of McGuire's treating providers reported only approximately one month later that McGuire "continue[d] to use [marijuana] regularly" (AR 737). (*See* AR 34.)

Finally, McGuire claims that the ALJ failed to adequately consider the statements she made in her Function Report and at the administrative hearing regarding her inability to leave the house on her own. (*See* Doc. 14-1 at 20, Doc. 20 at 1-2.) The ALJ, however, reasonably found these statements not entirely credible. (AR 31.) As noted above, the record demonstrates that, at least part of the reason that McGuire infrequently left the house was because of transportation problems. (*See, e.g.,* AR 53, 311, 332, 661.) The record also reflects that financial constraints limited McGuire's ability to engage in social activities. For example, in her Function Report, McGuire stated that she "ha[d] no income to spend on recreation or hobbies." (AR 196.) And a March 2008 progress note states that McGuire appeared to be bored, but was "unable to do anything about it due to . . . lack of transportation[] and finances." (AR 680.) Likewise, a June 2008 progress note indicates that, even after getting a car, McGuire's recreational and social activities were "restricted due to finances." (AR 672.) The note specifies that "the cost of gas [wa]s a big issue" and McGuire was "always short on money to do . . . fun things." (*Id.*)

## **Conclusion**

In sum, the ALJ correctly considered the record as a whole in determining McGuire's RFC, and substantial evidence supports that determination. Accordingly, I recommend that McGuire's motion (Doc. 14) be DENIED, the Commissioner's motion (Doc. 19) be GRANTED, and the decision of the Commissioner be AFFIRMED.

Dated at Burlington, in the District of Vermont, this 20th day of April, 2012.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).